CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

July 01, 2025

LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | | |
|---|---|---|
| **ANDY L. RALSTON** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:23CV00348 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **KYLE SMITH, ET AL.,** | ) | JUDGE JAMES P. JONES |
| | ) | |
| Defendants. | ) | |

*Andy L. Ralston, Pro Se Plaintiff; D. Patricia Wallace, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL CRIMINAL JUSTICE & PUBLIC SAFETY DIVISION, Richmond, Virginia, for Defendants Newcomer and Graham; Austin L. Obenshain, Grace Morse-McNelis, FRITH ANDERSON + PEAKE, Roanoke, Virginia, for Defendants Smith, Lokey, and Riggin.*

The plaintiff, an unrepresented Virginia inmate, filed this civil action under 42 U.S.C. § 1983, alleging that prison officials violated his rights to appropriate medical care for a rash. Ralston alleges claims under the First, Eighth, and Fourteenth Amendments to the United States Constitution, and under state law.[1] Defendants Newcomer and Graham have filed a Motion to Dismiss, and the other

---

[1] The Amended Complaint, ECF No. 44, now the operative pleading in the case, refers to the following defendants: Assistant Warden Newcomer of Augusta Correctional Center (Augusta), a prison operated by the Virginia Department of Corrections (VDOC); Kyle Smith, M.D.; Loretta Graham, Americans with Disabilities Act (ADA) Coordinator at Augusta; Dorinda Lokey (formerly Dameron), RN, Augusta Health Service Administrator (HSA); and Viola Riggin, Chief Executive Officer (CEO) of Vital Core Health Strategies.

defendants have filed Motions for Summary Judgment.  Ralston has also filed a so-called summary judgment motion.  All dispositive motions have been fully briefed.  After review of the record, I conclude that the defendants' motions must be granted, and Ralston's motion must be denied.

## I. BACKGROUND.

### A.  Ralston's Allegations and Claims.

Ralston's pro se pleading labels a purported fifteen claims against five defendants, but these claims overlap extensively.  Therefore, rather than addressing Ralston's claims as he has labeled them, I will summarize his allegations and issues as effectively as I can.

On March 16, 2020, Ralston sued VDOC Director Clarke and state ADA Coordinator Marano, claiming, among other things that while Ralston was confined at Sussex I State Prison (Sussex I), he was denied accommodation for his hearing loss, in violation of the ADA and the Rehabilitation Act (RA).  *Ralston v. Clarke*, No. 1:20CV00290 (E.D. Va.).  During the pendency of that lawsuit, on April 29, 2021, VDOC officials transferred Ralston to Augusta.

Ralston allegedly asked Augusta's ADA Coordinator L. Graham about getting "proper 'medical care' and other auxiliary aids that is required for the hearing

impaired." Am. Compl. 3, ECF No. 44.[2]  But, after some months, Ralston entered into a settlement agreement with Marano and Clarke in *Ralston v. Clarke*, No. 1:20CV00290.  Ralston's attorney executed the agreement on February 8, 2022, and a copy is attached to the Amended Complaint in this case.  It provided that Ralston would be transferred within 21 days to Coffeewood Correctional Center (CWCC) and that VDOC would "install a stationary TTY phone . . . for hearing impaired inmates" at CWCC.  *Id.* Exhibits, at 1-3, ECF No. 44-1.  Through the agreement, Ralston released VDOC, its employees, agents, and others from any and all claims that were raised in, could have been raised in, arose out of, related to, or in any way, directly or indirectly involved issues in the 2020 lawsuit.  *Id.* at 2.

In May 2021, while Ralston was confined at Augusta, he had an appointment with Dr. Smith and showed him a "'<u>RASH</u>' that was about 6 inches in diameter." Am. Compl. 4, ECF No. 44.  Dr. Smith allegedly gave him some "Benindine" ointment that he said should help.  *Id.*  The ointment container said not to use it "under the arm pits, or around the groin area."[3]  *Id.*  The second ointment, "'Transconine 05%' did nothing to help," allegedly.  *Id.*  The third ointment, "'Transconine 1%,'" allegedly "ended up making the supposedly (Eczema) worst,

---

[2]  In this Opinion and Order, page references to the record will refer to the page numbers assigned by the court's electronic filing system.

[3]  Ralston's misspellings are corrected throughout this Opinion when the actual word is clear from the context.

within days [Ralston's] body was 'covered 65% of his body with this RASH, it had swelled and spread causing extreme ITCHING until it was bleeding, and the doctor refused to help," allegedly. *Id.*

Ralston filed complaint forms about his medical care. Dr. Smith did a skin "biopsy" and laboratory results in November 2021 said the rash resembled eczema. *Id.* Ralston told Dr. Smith that he had experienced an "<u>Allergic Reaction</u>" to the ointment provided. *Id.* Allegedly, "Dr. Smith got outraged and sent [Ralston] out without any medication for the extreme itching and bleeding." *Id.*

On December 20, 2021, Ralston had another appointment scheduled with Dr. Smith. After he waited an hour, a nurse told him the visit had been cancelled. Ralston allegedly next saw Dr. Smith on December 26, 2021. When the doctor gave Ralston Transconine 1% ointment, Ralston told him about his supposed allergic reaction to this medication. Dr. Smith allegedly told Ralston that he could "either use this ointment or nothing." *Id.* at 4–5.

On February 15, 2022, Ralston was examined by a "'Dermatologist specialist' about the (Eczema)." *Id.* at 5. The doctor said she had requested, but had not received, a copy of the biopsy report. But when she examined the rash, she diagnosed ringworm.[4] Ralston complained to Lokey and Riggin that Dr. Smith had

---

[4]    Ralston consistently refers to this diagnosis as ringworms, although it is undisputed that the condition to which this term refers is ringworm (singular), a fungal infection with no worms involved.

failed to effectively diagnose and treat the rash and had delayed sending Ralston to a specialist.[5]  Apparently, he believes they should have investigated Dr. Smith's medical decisions about his care and failed to do so.

Liberally construed, Ralston's Amended Complaint alleges claims under the First, Eighth, and Fourteenth Amendments to the United States Constitution, and under state negligence and medical malpractice laws.  He also complains that the defendants have violated VDOC policies and repeatedly mentions the ADA.  As relief, he seeks monetary damages.[6]

### B.  The Defendants' Summary Judgment Evidence.

Defendant Viola Riggin, as CEO of VitalCore, heads a national corporation, based in Topeka, Kansas, that provides correctional health care services to individuals in custody in numerous facilities around the country.  On December 12, 2021, VitalCore replaced a prior health services company as the entity contracted to

---

[5]  Ralston appears to have a date wrong when he alleges that he complained to Riggin about Dr. Smith's diagnosis and treatment on "1/30/21," as this date occurred nearly a year before Riggin's company, VitalCore, began contracting with the VDOC to provide care for inmates at Augusta.  Am. Compl. 12, ECF No. 44.

[6]  Ralston also seeks declaratory relief stating that defendants Dr. Smith and Graham violated his rights in various ways.  Ralston is no longer confined at Augusta, however. Therefore, his attempted claims for declaratory relief regarding his past medical treatment there are without merit.  *Gilmore v. Bostic*, 659 F. Supp. 2d 755, 764 (S.D.W. Va. 2009) (finding improper requests for declaratory relief when plaintiff alleges only past conduct and no continuing conduct or immediate threat of injury from defendant).

provide comprehensive healthcare to VDOC inmates in certain prisons in the Commonwealth. VitalCore held that contract for inmates at Augusta from December 12, 2021, until May 24, 2023, when the VDOC itself took over providing health care at that facility.

Riggin denies that she ever received any correspondence from Ralston,[7] or that she ever refused him healthcare. She states that she is not a healthcare provider and did not personally provide healthcare services to anyone at Augusta. She explains that in her position with VitalCore, she did not oversee, supervise, or hire healthcare providers at individual prisons, including Augusta. Rather, VitalCore used regional or site-specific medical professionals to make oversight, supervision, or staffing decisions about its providers. Riggin reports that she did not direct, control, or interfere with decisions made by physicians or other healthcare providers procured by VitalCore. Providers used their own education, training, and experience to decide and provide appropriate medical care for inmates. Ralston does not dispute the nature of Riggin's position at VitalCore or her qualifications and contract obligations.

Dr. Smith is a physician licensed to practice medicine in Virginia and is Board Certified in Family Medicine. He provided primary care services to inmates at

---

[7] Ralston attempts to refute this statement by providing a copy of a letter he addressed to Riggin about his healthcare at Augusta. He submits no evidence to indicate that Riggin ever received or read this letter.

Augusta and also served as Medical Director there from 2018 through May 23, 2023. He based his Declaration in this case on his personal knowledge and recollection of Ralston and review of Ralston's medical records, created in the usual course of business, which Dr. Smith has authenticated and provided as attachments that corroborate his notes as reflected in his Declaration about his professional visits with Ralston.

From the day Ralston first arrived at Augusta on April 27, 2021, Dr. Smith assessed his several medical needs. He adjusted medications and followed up to refer Ralston to see an audiologist and a gastroenterologist, and to get a liver ultrasound. Mem. Supp. Mot. Summ. J. Ex. A, Smith Decl. ¶¶ 5-7, ECF No. 165-1.

On May 15, 2021, records show that a nurse examined Ralston at the Augusta clinic regarding a complaint about a rash. The nurse noted that Ralston described an itchy rash on his groin and buttock and asked for Lotrimin, an antifungal medication. The nurse referred Ralston to see Dr. Smith.

Dr. Smith examined Ralston for his skin complaint on June 9, 2021. The doctor noted a diffuse pruritic rash that Ralston reported "he has had for years" and "nothing has taken it away but lotrimin has helped with the itching." *Id*. ¶ 9. During his physical examination, Dr. Smith recorded that the rash was mostly on the buttocks and thighs. He prescribed Lotrimin cream and planned a biopsy of Ralston's skin.

At appointments with Ralston later in June and July 2021 for unrelated complaints, Dr. Smith did not note any complaints from Ralston about the rash. On July 28, 2021, Dr. Smith performed a tissue punch biopsy and sent the recovered tissue sample to an outside laboratory. The results indicated "changes [ ] suggestive of mild spongiotic dermatitis. Differential diagnosis includes allergic contact dermatitis, auto-eczematization and nummular dermatitis." *Id.* ¶ 12. Records indicate that on August 11, 2021, a nurse met with Ralston, advised him that the biopsy results were consistent with eczema, and provided him with Triamcinolone 0.5% cream that Dr. Smith had prescribed.

A nurse next saw Ralston for a complaint about his skin rash on September 2, 2021. The nurse noted Ralston's report of having had this skin problem for five years, but that the cream Dr. Smith had prescribed had stopped the itch and appeared to be reducing the size/area of the affected area. Ralston also asked for a larger tube of the medication.

On September 21, 2021, Dr. Smith again examined Ralston and noted the inmate's report that the cream had helped, but he had run out of it, and the rash was getting worse. Dr. Smith prescribed Diprolene, another medication designated to treat a variety of skin issues. He suggested that Ralston consider changing his soap, but the inmate did not seem open to this option, and he also refused the doctor's offer of a steroid injunction.

Nurse Lokey saw Ralston on October 5, 2021, when he reported a rash around the groin area, buttocks, back, and hips, and complained: "One tube of cream is not enough." *Id.* ¶ 17. He asked for more medication, but also expressed concern about a warning on the label listing side effects.

Dr. Smith examined Ralston on November 2, 2021, noting diffuse scaly patches on various locations of his body. "The primary diagnosis was eczema." *Id.* ¶ 18. Dr. Smith prescribed Triamcinolone, which is used for eczema and dermatitis.

On November 16, 2021, Ralston submitted an Emergency Grievance, claiming he was experiencing '"a major reaction to the cream'" Dr. Smith had prescribed, that the rash had '"gotten worse and it [was] welping [sic] into sores.'" *Id.* ¶ 19. Later that day, a nurse examined Ralston, noting a rash, with the "worst area on R groin with minor area on head of penis. Areas under arm to groin continue to worsen with med stopped." *Id.* ¶ 20. Per nursing guidelines, the nurse gave Ralston Benadryl. The nurse noted on Ralston's report that he had stopped using the prescribed cream on November 11, 2021.

On November 23, 2021, Dr. Smith saw Ralston for a follow up. He noted Ralston's report that he only tried the cream for two days and that covering the rashy areas had made them worse. Based on this report, Dr. Smith believed that Ralston had incurred a new fungal infection, which can occur in dark moist environments, and noted that he had not given the new steroid cream a chance to work. Dr. Smith

proposed a trial of oral Diflucan, an antifungal medication, to see if the condition did, indeed, have a fungal element. According to Dr. Smith's medical notes, Ralston flatly refused this treatment option or any others the doctor raised that day and demanded to see a dermatologist. Dr. Smith placed an order for a dermatology consult, but told Ralston that it would likely be many months until an appointment could take place.

Dr. Smith states that he did not believe Ralston had an urgent medical condition and that he had declined offered and available treatment options. Dr. Smith also explains that he had no control over outside provider schedules.

On February 12, 2022, a dermatologist examined Ralston's rash. The specialist's diagnoses included "*tinea corporis*, more commonly known as 'ringworm," a fungal infection of the skin, and "*tinea crusis*, more commonly known as jock itch, also a fungal infection of the skin." *Id.* ¶ 23. The dermatologist prescribed Lamisil, an antifungal medication.

Dr. Smith explains that these fungal infections are easily spread and symptoms typically appear between four to ten days after contact with the organism. Thus, Ralston's "inference that the eczema, diagnosed both clinically and by biopsy in early August 2021, was a 'misdiagnosis' and was actually this fungal infection all along, is not medically logical." *Id.* ¶ 24. Dr. Smith bases this medical judgment on medical notes indicating Ralston's reports that his rash improved for months, but

then he experienced "a sudden acute onset of a rash with 'sores' that was also associated with covering the areas." *Id.* Dr. Smith states: "At the time [Ralston] reported the problem, I suspected a fungal infection, and the timeline was consistent with a <u>new</u> fungal infection, for which treatment options were offered. The dermatologist confirmed my suspicions." *Id.*

On March 1, 2022, VDOC officials transferred Ralston to Coffeewood Correctional Center. Dr. Smith had no interaction with Ralston after he left Augusta. Dr. Smith "maintain[s] that all treatment decisions [he] made for [Ralston] were reasonable and appropriate and based on the patient's clinical picture at the time." *Id.* ¶ 32.

As the former Medical Director for Augusta, Dr. Smith is familiar with the roles of its other healthcare staff, including the role in which Derinda Lokey, RN, served as HSA. The HSA position is administrative. As HSA, Lokey was not responsible for, or personally involved in, approving or scheduling appointments for inmates with outside medical providers. Dr. Smith also states that as a nurse, Lokey was not able to make medical diagnoses and "would not have been involved in disciplinary matters" or grievance decisions. *Id.* ¶ 29.

## II.    DISCUSSION.

### A.    The Standards of Review.

"A Rule 12(b)(6) motion to dismiss tests only the sufficiency of a complaint."
*Mays ex rel. Mays v. Sprinkle*, 992 F.3d 295, 299 (4th Cir. 2021).[8]  In considering a
Rule 12(b)(6) motion, "[t]he district court must accept all well-pleaded allegations
in the complaint as true and draw all reasonable inferences in the plaintiff's favor."
*Langford v. Joyner*, 62 F.4th 122, 124 (4th Cir. 2023).  A complaint must plead facts
sufficient to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v.
Twombly*, 550 U.S. 544, 570 (2007).  A facially plausible claim includes factual
content that "allows the court to draw the reasonable inference that the defendant is
liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"[C]ourts are obligated to liberally construe pro se complaints, however
inartfully pleaded*."  Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 540 (4th Cir.
2017).  Liberal construction, however, does not allow me to formulate constitutional
or state law claims for Ralston based on conclusory statements alone.  *Beaudett v.
City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).  "[A] pleading that offers
labels and conclusions or a formulaic recitation of the elements of a cause of action
will not do.  Nor does a complaint suffice if it tenders naked assertions devoid of

---

[8]  I have omitted internal quotation marks, alterations, and/or citations here and
throughout this Opinion, unless otherwise noted.

further factual enhancement." *Iqbal*, 556 U.S. at 678. "[T]he court need not accept legal conclusions, threadbare recitals of the elements of a cause of action, or conclusory statements." *Langford*, 62 F.4th at 124.

The Federal Rules of Civil Procedure provide that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To preclude summary judgment, a nonmovant must present a "genuine" dispute as to a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In considering a summary judgment motion, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party," and the movant "has the initial burden to show absence of evidence to support the nonmoving party's case." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). A pro se litigant's verified complaint must be considered as an affidavit and may defeat a motion for summary judgment "when the allegations contained therein are based on personal knowledge." *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021).

## B. Initial Matters.

In the text of the initial Complaint, Ralston mentions former VDOC Director Clarke and VDOC ADA Coordinator Marano and complains about things Marano allegedly did or failed to do related to accommodations for Ralston's hearing

impairment.  Ralston did not name Marano or Clarke as a defendant in the heading of the Amended Complaint, however, and indicates that he "has removed" them from the lawsuit which is now "just 'Medical Claims.'"[9]  Am. Compl. 1, ECF No. 44.  Therefore, I do not consider Marano and Clarke to be properly identified as parties to this lawsuit.

Similarly, although Ralston's Amended Complaint mentions the ADA and his hearing aids and his hearing impairment in passing, it does not state facts showing that any of the defendants in this case knew of specific problems he had with either of these issues while at Augusta that were not included in the settlement agreement by which Ralston was to be transferred to another prison.  I will not craft any additional ADA claims for Ralston from scraps of language in the text of a twenty-seven-page Amended Complaint and multiple, lengthy response documents. *Beaudett*, 775 F.2d at 1278.  Moreover, the record indicates that Ralston has litigated accommodations of his hearing impairment in other lawsuits.  Therefore, I consider his pleading here to raise only claims concerning rash conditions he experienced in 2021-2022 at Augusta under § 1983 or state law and not under the ADA.[10]

---

[9]  In response to the Motion to Dismiss by Newcomer and Graham, Ralston argues that their defense of res judicata to his ADA claims is not necessary, because his Amended Complaint "removed the ADA claims and made the complaint strictly a Medical Claim." Resp. 8, ECF No. 84.

[10]  It appears that Ralston believes that because of his hearing impairment, the ADA provides a separate legal avenue by which he may raise claims about the defendants'

Ralston has presented his claims in this case under § 1983, a statute that permits an aggrieved party to file a civil action against a person for actions taken under color of state law that violated his constitutional rights. *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). Ralston complains that various defendants violated state policies or job responsibilities through their actions or omissions, such as, failure to investigate his complaints about his medical care, failure to train Graham as an ADA coordinator so she had to consult with superiors, and so on. However, a state official's failure to abide by a state law or policy of any kind cannot support a claim that his or her actions deprived the plaintiff of federal rights as required to state a claim actionable under § 1983. *Riccio v. Cnty. of Fairfax,* 907 F.2d 1459, 1469 (4th Cir. 1990).

---

alleged actions or omissions regarding medical treatment of his skin condition and other alleged constitutional violations in 2021 and 2022. He is mistaken.

The ADA as a separate federal statute provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Ralston has not alleged facts in this case showing that anyone at Augusta provided inappropriate medical care for his skin condition because he was hearing impaired. Moreover, "the ADA cannot be used to assert a claim of inadequate medical care." *Baxley v. Jividen*, 508 F. Supp. 3d 28, 62 (S.D.W. Va. 2020).

Ralston also mentions the ADA in connection with his other, constitutionally-based claims such as substantive and procedural due process, equal protection or discrimination, and retaliation. Finding no support for this use of ADA provisions here, I will address Ralston's claims under the constitutional provisions that they implicate through the liberal construction of his allegations.

Ralston apparently sues all of the defendants in both their individual and official capacities for monetary damages. It is well established that a plaintiff cannot recover monetary damages from state officials sued in their official capacities. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983.").

To the extent that Ralston sues defendants over their responses to his complaints through the prison grievance procedure, such claims fail. It is well established that "inmates have no constitutional entitlement or due process interest in access to a grievance procedure. An inmate thus cannot bring a § 1983 claim alleging denial of a specific grievance process." *Booker*, 855 F.3d at 541.

For the reasons stated, I will dismiss all claims against Clarke and Marano, all ADA claims, all claims alleging violations of VDOC policy, including grievance procedures, and all § 1983 claims for damages against the defendants in their official capacities.

## C.  Due Process Claims.

The Due Process Clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This provision can generate two types of claims: substantive due process and procedural due process. "Procedural due process prevents mistaken or unjust deprivation, while substantive due process prohibits certain actions regardless of

procedural fairness." *Snider Int'l Corp. v. Town of Forest Heights*, 739 F.3d 140, 145 (4th Cir. 2014). Ralson asserts both types.

If another constitutional provision, such as the First or Eighth Amendments or the Equal Protection Clause, provides an explicit source of protection for the right at issue, these constitutional sources, and not the generalized notion of substantive due process must be the court's guide to analyze such claims. *Albright v. Oliver*, 510 U.S. 266, 273 (1994). Therefore, I will grant the defendants' motions as to Ralston's purported claims of substantive due process.

Where an inmate asserts procedural due process claims, I must first consider whether he has asserted a protectable interest and, if so, whether he was afforded the minimum procedural protections required by the Fourteenth Amendment before he was deprived of that interest. *Incumaa v. Stirling*, 791 F.3d 517, 526 (4th Cir. 2015). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word liberty, . . . or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Only if an inmate establishes a protected liberty interest at stake, such as a loss of earned good conduct time to reduce his sentence of confinement, is he then entitled to constitutionally required procedural protections before governmental actors can deprive him of that interest. *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974).

State statutes create a liberty interest entitled to the federal constitutional due process protections only if they protect against status changes that "impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," or "inevitably affect the duration of" the inmate's confinement. *Sandin v. Conner*, 515 U.S. 472, 484, 487 (1995). Ralston does not identify any state provision that creates a protected liberty interest related to his complaints of skin conditions at Augusta. Rather, he appears to believe that through his separate constitutional claims, such as deliberate indifference and discrimination, he has a protected liberty interest worthy of federal procedural protections. I find no merit to this contention.

Furthermore, Ralston's procedural due process claims are built of conclusory assertions. He states no facts about what procedural protections any defendant denied him related to his medical care and complaints about it. Neither the court nor the defendants are obligated to create claims for Ralston from general phrases alleging due process denials or violations or random documents attached as exhibits without explanation in the Amended Complaint itself. *Iqbal*, 556 U.S. at 678. I will grant the defendants' motions as to Ralston's procedural due process claims.

D. Retaliation and Discrimination Claims.

"To state a colorable First Amendment retaliation claim, a plaintiff must allege that (1) he engaged in protected First Amendment activity, (2) the defendant

took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct." *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020). Filing grievances is an activity protected against retaliation under the First Amendment. *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017). Merely conclusory allegations of retaliation, however, cannot suffice to state any actionable claim under § 1983. *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994).

Equal Protection, or discrimination, claims arise under the Fourteenth Amendment. To state a claim of an equal protection violation, a plaintiff must demonstrate (1) that he has been treated differently from others who are similarly situated, and (2) that the unequal treatment was the result of intentional discrimination. *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).

Ralston uses some form of the words retaliate and discriminate numerous times in the Amended Complaint in conclusory statements. For example, he alleges that by failing to ensure that Ralston received proper medical care at Augusta, Newcomer retaliated and discriminated against him because of Ralston's prior lawsuit and undated complaints he had filed. Am. Compl. 8, ECF No. 44. Ralston does not state facts to support a finding that Newcomer knew of or based any decision about Ralston's medical care on his complaints or lawsuits. He also does not state facts showing that other inmates with similar medical problems received

different attention from Newcomer or Dr. Smith.  Because Ralston offers no factual support for his generalized assertions of retaliation and discrimination, I need not accept them as true, and I decline to discuss them further.  *Iqbal,* 556 U.S. at 678.  I will grant the defendants' motions as to all retaliation and discrimination claims.

### E.  Eighth Amendment Claims.

"Society does not expect," nor does the Eighth Amendment require, that inmates have "unqualified access to health care."  *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).  Rather, only "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain" that violates constitutional protections.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  Thus, the prisoner plaintiff must show that, objectively, he was suffering from a serious medical need and, subjectively, the prison staff was aware of the need for medical attention, but failed to respond reasonably to that need.  *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

To satisfy the objective facet, the plaintiff's medical condition must "be serious – one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Phoenix v. Amonette*, 95 F.4th 852, 859 (4th Cir. 2024).  "Mere delay" in providing access to treatment "is [ ] not enough" to satisfy the objective prong of the legal standard.  *Moskos v. Hardee*, 24 F.4th 289, 298 (4th Cir. 2022).  Rather, a plaintiff must show that, objectively, "the delay itself place[d] the prisoner

at 'substantial risk of serious harm,' such as when a prisoner's condition deteriorates markedly or the ailment is of an urgent nature." *Id.*

To satisfy the subjective prong, the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." *Id.* at 838. A medical defendant's conduct must have been "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier ex rel. Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837). A defendant's inadvertent or negligent conduct is not enough to support a constitutional claim actionable under § 1983. E*stelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Similarly, "[a]n inmate's mere disagreement with the course of treatment provided by medical officers will not support a valid Eighth Amendment claim." *Jackson v. Sampson*, 536 F. App'x 356, 357 (4th Cir. 2013) (unpublished).

Even if the official knew of a substantial risk to an inmate's health, that officer can escape liability by showing he or she "responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth

Amendment is to ensure reasonable safety." *Farmer*, 511 U.S. at 844. Defendants other than the patient's treating professional may rightfully rely on that provider's expertise in determining the proper course of treatment for the plaintiff. *Miltier*, 896 F.2d at 855.

The heart of Ralston's case here is his contention that his rash was not properly diagnosed or treated for several months, and the defendants did not take action to correct that problem more quickly. Dr. Smith, as Ralston's treating physician at Augusta, made the decisions — first, providing Lamisil, an antifungal that Ralston said had helped, and later, in diagnosing him with eczema through a skin biopsy, and still later, offering oral medication for a possible, additional or different fungus-related rash. Dr. Smith based his decisions on his clinical observations during various physical examinations and observations, the biopsy, and trying several medications and different dosages.

The other defendants — Newcomer, Graham, Riggin, and Lokey — rightfully could rely on Dr. Smith's professional decisions about what treatment was appropriate for Ralston's condition at any given time. *Id.* None of them is a physician who had any responsibility or expertise to second-guess the treating physician's medical judgments about Ralston's condition or care. Moreover, when these defendants reviewed Ralston's medical records while he was at Augusta, they would have seen that in November 2021, Dr. Smith referred him to a dermatologist

at Ralston's insistence with the warning that such an appointment would take months.  Dr. Smith has provided evidence that he had no control over the specialist's schedule, and Ralston does not provide evidence that any defendant could have procured him a quicker appointment.  I will grant the Motion to Dismiss as to Newcomer and Graham as to Ralston's Eighth Amendment deliberate indifference claims, and I will grant summary judgment for Riggin and Lokey as to such claims.[11]

Dr. Smith is also entitled to summary judgment because Ralston has not demonstrated either a serious medical need for different treatment or deliberate indifference by Dr. Smith.  Rather, Dr. Smith's medical notes attached to the summary judgment motion indicate that Dr. Smith regularly assessed Ralston's condition, conducted diagnostic tests, and offered various treatment options he believed would alleviate the condition as he observed it at various times.  His notes indicate that when Ralston first came to him in May 2021 complaining of a rash, Ralston said Lotrimin helped the itching and Dr. Smith prescribed "Lotrimin," but

---

[11]    Ralston complains that the defendants somehow violated his rights merely because ringworm is an infectious disease that might have spread to others.  Ralston, however, is not a lawyer and has no right to pursue litigation on behalf of other inmates who contracted, or might have contracted, ringworm by being around Ralston.  28 U.S.C. § 1654 ("In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein."); *Myers v. Loudoun Co. Pub. Schs.*, 418 F.3d 395, 401 (4th Cir. 2005) (finding that a pro se person's right to litigate for oneself does not create a similar right to litigate on behalf of others).

planned also to do a skin biopsy of the rash.[12]  Smith Decl. ¶¶ 8–9, ECF No. 165-1;

Ex. B, at 11–12, ECF No. 165-3.  The results of Ralston's skin biopsy indicated the

rash was consistent with eczema or another type of dermatitis, so Dr. Smith

proscribed a different medication, Triamcinolone 0.5%.  A nurse who examined

Ralston in early September noted that he wanted a "larger tube" because it seemed

to be helping.[13]  Smith Decl. Ex. B at 4, ECF No. 165-3.  At Dr. Smith's next visit

with Ralston on September 21, 2021, he also noted the inmate's report that the cream

had helped, but ran out, and then the rash had gotten worse.  Dr. Smith prescribed a

different cream, Diprolene, suggested changing soap, or trying a steroid injection,

options Ralston rejected.  *Id.* at 2, 3.

Lokey noted after an October 5, 2021, exam that Ralston reported he needed

more medication.  Dr. Smith examined Ralston on November 2, 2021, noted his

---

[12]  Ralston complains that discovery documents he received did not indicate that Dr. Smith prescribed Lotrimin, and Ralston denies that he did.  Ralston does not deny, however, that he received the records attached to Dr. Smith's Declaration on summary judgment.  Certainly, Ralston has not offered any admissible evidence on which he could show that Dr. Smith did not prescribe Lotrimin after the first appointment in May 2021.  I find no material dispute of fact here.

[13]  Ralston makes conclusory claims that he never told any medical staff that the medications Dr. Smith prescribed seemed to be helping or that the rash was improving. Such self-serving conclusory statements are not sufficient evidence to create a material dispute of fact on this point.  Dr. Smith's evidence comes from medical records maintained in the normal course of business, as well as his own sworn declaration.  Moreover, the evidence is that the doctor offered alternative treatments for the rash almost every time he examined Ralston.  Thus, Ralston's disagreements with the medical notes are, at most, assertions of negligent practice and not deliberate indifference.

belief that the rash was eczema, and prescribed a higher concentration of Triamcinolone. On November 16, 2021, Ralston claimed in an Emergency Grievance to have had a "major reaction" to the medication. When Dr. Smith saw Ralston on November 23, 2021, Ralston reported that he used the medication for only two days and covered the rash areas, which made them worse. At this point, believing these characteristics to be consistent with a possible new fungal infection, Dr. Smith suggested trying an oral, antifungal medication, but Ralston refused. He demanded to see a dermatologist instead, even knowing it could take months to get an appointment. Dr. Smith made the referral that same day.

Although the dermatology appointment for Ralston did not occur until February 12, 2022, Ralston offers no evidence that Dr. Smith's actions between November 23, 2021, and February 12, 2022, delayed Ralston's ability to obtain treatment for the rash. Indeed, Dr. Smith offered at least two alternative treatments on November 23, 2021 — continue a steroid cream Ralston had tried for only two days or start an antifungal, oral medication. Ralston refused them. Dr. Smith also offers his medical judgment that Ralston's rash was not a serious medical need in November 2021, and Ralston presents nothing to the contrary. He complains the rash was unpleasant and even bleeding at times, presumably from his scratching at the itchy areas. But he rejected offered treatment, and even three months later, the dermatologist merely prescribed Lotrimin, another antifungal medication.

Ralston's primary contention is that Dr. Smith misdiagnosed the nature of his rash for months as eczema, when it was actually (and allegedly, obviously) ringworm all along. The doctor has explained his theory that at different times, and perhaps simultaneously, Ralston suffered from both types of skin irritation, eczema and ringworm. Dr. Smith prescribed Lotrimin the first time Ralston complained about the rash, but then after a skin biopsy indicated eczema, he prescribed treatment for that condition. Then in November 2021, the doctor suspected a fungal element and suggested an oral medication to treat that. When Ralston did not accept such treatment, the doctor referred him to the dermatologist who confirmed the fungal infection of ringworm. Ralston makes much of a claim that the dermatologist took one look at the rash in February 2022 and diagnosed ringworm. However, Ralston does not allege, let alone offer evidence showing, that the rash Dr. Smith observed in November 2021 presented the same symptoms that Ralston showed to the specialist in February 2022, nearly three months later. Nor is there evidence that Lamisil from the dermatologist completely cured the rash.

The defendants argue that a skin rash does not present a serious medical need. Indeed, other courts have found that relatively minor skin irritations, including eczema and ringworm, are not serious medical needs under the *Farmer* analysis. *Benjamin v. Higgs*, No. 1:08CV836 (JCC/TRJ), 2009 WL 483149, at *3 (E.D. Va. Feb. 25, 2009) (finding self-styled "allergic reaction" to prescribed medication that

manifested apparently for three days' duration as shortness of breath, vomiting and hives, was not serious medical need to warrant Eighth Amendment protection), *aff'd,* 326 F. App'x 183 (4th Cir. 2009) (unpublished); *but see Mitchell v. Scott*, No. 17-CV-245-NJR-DGW, 2017 WL 3288505, at *1 (S.D. Ill. Aug. 2, 2017) (finding plaintiff could proceed with Eighth Amendment claim when he alleged being denied adequate medical treatment for infection of genital area, where he allegedly suffered from skin discoloration, pain, irritation, itching, numbness, and coldness and articulated reasons for believing that his condition was the result of sexually transmitted disease or ringworm infection).

Even if Ralston could prove that his rash qualified as a serious medical need, however, given the location and size of the area and active bleeding at times, he has not demonstrated that Dr. Smith acted with deliberate indifference to the condition. I have summarized the varied assessments and alternative treatments the doctor offered to Ralston, including referral to a specialist, as he made reasonable efforts to address the inmate's rash and the current symptoms the doctor observed during each examination over several months. Ralston's deliberate indifference argument is, in essence, that any competent doctor would have recognized and treated the rash immediately as ringworm. Such a disagreement between a doctor and patient, or even between doctors, regarding diagnosis and appropriate course of treatment cannot support a valid deliberate indifference claim. *Jackson*, 536 F. App'x at 357.

Moreover, the record does not support a finding that Dr. Smith's diagnoses were inaccurate, since a laboratory test on the skin biopsy in August 2021 indicated eczema and he later also offered medication to treat a possible fungal infection.

I conclude that Dr. Smith is entitled to summary judgment as a matter of law on Ralston's Eighth Amendment claims regarding his medical care for a rash in 2021–2022. Therefore, I will grant Dr. Smith's motion.

### F. Ralston's Summary Judgment Motion.

Although Ralston has filed a document that he styles as seeking summary judgment on his behalf, his arguments and evidence, at the most, attempt to create disputes of the evidence on which I have determined to grant summary judgment on behalf of the defendants. Ralston's alleged disputes are simply not material to the facts or the reasons on which I have concluded that the defendants are entitled to summary judgment as a matter of law. *Anderson*, 477 U.S. at 248. Moreover, as relief, Ralston's motion seeks a jury trial and does not argue that no material facts remain in dispute on which a jury could rule in the defendants' favor. Therefore, I will deny Ralston's so-called summary judgment motion.

### G. State Law Claims.

In various places in the lengthy Amended Complaint, Ralston asserts malpractice, misdiagnosis, and negligence. He complains that it took three months for him to have an appointment with an outside dermatologist, after Dr. Smith had

warned him of this likely timing and Ralston refused interim treatments that Dr. Smith offered.  In light of my conclusion that Dr. Smith is entitled to summary judgment on Ralston's deliberate indifference claim, I decline to exercise supplemental jurisdiction over the inmate's conclusory claims under state law, pursuant to 28 U.S.C. § 1367(c).  Rather, I will dismissal all such state law claims without prejudice.

### III.  CONCLUSION.

For the reasons stated, it is hereby **ORDERED** as follows:

1. The Motion to Dismiss, ECF No. 67, by defendants Graham and Newcomer, is GRANTED.

2. The Motions for Summary Judgment, ECF Nos. 161 and 163, by defendants Riggin, Lokey, and Smith, are GRANTED.

3. Plaintiff Ralston's Motion for Summary Judgment, ECF No. 182, is DENIED.

4. All state law claims are DISMISSED without prejudice, pursuant to 28 U.S.C. §  1367(c).

A separate Judgment will be entered.

ENTER:  July 1, 2025

/s/  JAMES P. JONES
Senior United States District Judge